WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Save Our Sonoran, Inc., | ) | No. CV-02-0761-PHX-SRB |
| | ) | |
| Plaintiff, | ) | **ORDER** |
| | ) | |
| vs. | ) | |
| | ) | |
| Lt. General Robert B. Flowers, in his capacity as Commander, U.S. Army Corps of Engineers, et al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

This action challenges a permit issued by the United States Army Corps of Engineers ("Corps") authorizing work in desert washes located on a 608-acre parcel of land where Defendant 56th & Lone Mountain, L.L.C. ("Lone Mountain") plans to construct a gated residential community.  Before the Court are Lone Mountain's Motion to Dismiss Plaintiff's First Supplemental Complaint ("FSC") brought pursuant to Federal Rule of Civil Procedure 12(b)(1) (Doc. 175) and Plaintiff Save Our Sonoran, Inc.'s ("SOS") Motion for Preliminary Injunction (Doc. 160[1]).

---

[1]Doc. 160 is Plaintiff's Motion for Temporary Restraining Order.  At a hearing on April 5, 2006, the Court granted Plaintiff's Motion to Convert the Motion for Temporary Restraining Order to a Motion for Preliminary Injunction (Doc. 181).

I.      BACKGROUND

At a public auction in 2001, the State of Arizona sold to Lone Mountain a 608-acre parcel of undeveloped land in north Phoenix known as Section 16.  Prior to its sale, Section 16 was used by neighbors and others for hiking, horseback riding and other recreational activities.  Section 16 slopes down from nearby desert foothills and peaks and contains flora and fauna typical of the Central Arizona Uplands subsection of the Sonoran Desert including giant saguaro cacti, and ironwood and palo verde trees. The salient feature of Section 16, for purposes of this lawsuit, are the desert washes that cris-cross the property and carry water during periods of rain.  Pursuant to Section 404 of the Clean Water Act ("CWA"), the Corps has determined that 31.3 acres of washes, or 5% of the Section 16, constitute "waters of the United States," putting those washes under the Corps' jurisdiction and requiring a permit for any dredge and fill activities associated with them ("jurisdictional washes").

Lone Mountain proposes to construct on Section 16 a gated residential community consisting of 794 single-family homes.  In order to proceed with its project, Lone Mountain sought a permit from the Corps to place fill material and conduct activities that would impact 7.5 acres of jurisdictional washes that flow through the property.  The permit sought by Lone Mountain proposed sixty-six projects affecting the jurisdictional washes including the placement of road and utility crossings, pad fill, remediation, drainage and flood control measures.

On June 1, 2001, the Corps announced a thirty-day public comment period regarding Lone Mountain's proposed development and permit application.  According to Plaintiff, "hundreds of citizens, mostly area residents, objected to permit issuance," as did the U.S. Environmental Protection Agency ("EPA") and the U.S. Fish and Wildlife Service ("FWS") (First Supplemental Compl. ("FSC") at 6.)  The comments "urged the Corps to employ improved biological evaluation methodologies encompassing uplands as well as washes," to require mitigation measures to compensate for lost uplands, to require an environmental impact study ("EIS") or, "an expanded scope of assessment encompassing the direct, indirect and cumulative impacts of the underlying development project on a wide range of issues,

including habitat, flooding and drainage, and traffic and other infrastructural and quality of life impacts on the surrounding area."  (FSC at 6.)  Although some of those commenting requested a public hearing on the proposed permit, the Corps did not hold one.

The Corps conducted an Environmental Assessment ("EA"), as required by the National Environmental Policy Act ("NEPA"), and issued a finding of no significant impact ("FONSI").  The Corps concluded that the sixty-six dredge and fill projects would not significantly affect the environment or disturb the habitats of any endangered species.  The Corps limited its analysis in the first EA ("EA 1") to "the area of direct impact to waters of the U.S., plus the immediately contiguous upstream and downstream washes that might be indirectly affected by work in waters of the U.S." (EA 1 at 3-4.)  The Corps then issued the requested permit to Lone Mountain on March 13, 2002, subject to certain conditions.

Plaintiff filed its original Complaint in April 2002 against the Corps, its Commander, and Chief of the Regulatory Branch ("Federal Defendants") and Lone Mountain, alleging violations of NEPA, CWA and the Endangered Species Act ("ESA").  In May 2002, Plaintiff obtained a temporary restraining order ("TRO") and then, after a hearing, the district court ordered a preliminary injunction.  *See Save Our Sonoran, Inc. v. Flowers*, 227 F. Supp. 2d 1111 (D. Ariz. 2002).  The district court opinion by Judge Martone noted that "while the waters of the United States constitute about 5% of the total area, the washes are a dominant feature of the land and no development of the property could occur without affecting the washes." *Id.* at 1113.

The district court decision focused on EA 1's scope of analysis and found that it "raises substantial questions." *Id.* at 1114.  In particular, the court observed that in subparagraph D(1), "the Corps discusses the crossings as though they were 'merely a link' in a corridor type project.  But the washes run through the property the way lines run through graph paper." *Id.*  The court took particular exception to the fact that in subparagraph D(2), "the Corps limited its review to the area immediately adjacent to the crossings.  Yet the location of all of the uplands and all of the washes dictate where construction will be." *Id.* The court also took issue with subparagraph D(3), in which the Corps noted that only 5% of

1   the site is jurisdictional waters of the United States, but which the court found "would be far
2   more significant if the 5% were separated from the rest of the site.  But that 5% runs through
3   the entire 608 acres the way capillaries run through tissue."  *Id.*  Finally, in subparagraph
4   D(4), the court found that while the Corps' statement that "cumulative federal control and
5   responsibility are limited" is true in one sense because Section 16 is private property, "federal
6   control of this entire section could be extensive" because of the Corps' "duty to protect the
7   waters of the United States."  *Id.*

8         The district court concluded "that there are serious questions on the merits in this
9   case" and granted Plaintiff's motion for a preliminary injunction.  The court ordered that the
10  permit from the Corps was temporarily suspended and that the Federal Defendants and Lone
11  Mountain were "preliminarily enjoined from any activities that are within the scope of [the
12  permit] anywhere in section 16 . . . ."  *Id.*  At 1115.  In granting the preliminary injunction,
13  the court encouraged the Corps "to consider the preparation of a new Environmental
14  Assessment with a scope of analysis under [NEPA] as though federal action included the
15  entire project on all of section 16."  *Id.* at 1115.  After obtaining the preliminary injunction,
16  SOS learned that Lone Mountain was continuing some activities on the site, and sought
17  clarification from the court as to the scope of the injunction.  In June 2002, the court clarified
18  that the injunction was for "*any* activity in section 16 in furtherance of the project as planned
19  for which the permit was sought," effectively halting all work on Section 16.  (Order by J.
20  Martone, June 24, 2002.)

21        Lone Mountain, but not the Corps, appealed the district court's orders.  The Ninth
22  Circuit upheld the orders under a deferential standard of review, holding that "the district
23  court's order was grounded in its factual findings."  *Save Our Sonoran, Inc. v. Flowers*, 408
24  F.3d 1113, 1121 (9th Cir. 2005), *amending and superseding on denial of hearing*, 381 F.3d
25  905 (9th Cir. 2004)  ("A district court's order with respect to preliminary injunctive relief is
26  subject to limited review and will be reversed only if the district court 'abused its discretion
27  or based its decision on an erroneous legal standard or on clearly erroneous findings of
28  fact.'") (quoting *United States v. Peninsula Communications, Inc*., 287 F.3d 832, 839 (9th

1   Cir. 2002)).  The Court of Appeals found that "[t]he district court correctly held that the

2   Corps had improperly constrained its NEPA analysis to the washes, rather than considering

3   the development's effect on the environment as a whole."  *Id.*

4       Following the Ninth Circuit's decision, the Corps issued another public notice on June

5   6, 2005 announcing a thirty-day comment period on a supplemental site-wide EA.  On

6   October 28, 2005, the Corps issued a second environmental assessment ("EA 2"), another

7   FONSI, and a letter of permit modification to Lone Mountain.  The following month

8   Defendants sought to dissolve the preliminary injunction, which was based on EA 1.  This

9   Court, on February 28, 2006, vacated the first preliminary injunction and the clarification

10  issued in 2002.  The Court found the preliminary injunction to be moot because "the only

11  complaint presently pending before this Court challenges a permit issued pursuant to an

12  environmental assessment that has been superceded and replaced."  (Order by J. Bolton Feb.

13  28, 2006 at 3.)

14      In March 2006, the Court, in light of EA 2, allowed Plaintiff to file a supplemental

15  complaint.  In the FSC, Plaintiff alleges that "[a]lthough the 'expanded EA' may facially

16  comply with the Ninth Circuit's mandate regarding the scope of analysis, Plaintiff maintains

17  that it does not meaningfully expand upon the old EA and does not adequately assess the full

18  impacts of the Corps permit and the underlying development."  (FSC ¶ 26.)  The FSC asserts

19  that during the public comment period for EA 2, "Over one hundred comments were filed,

20  nearly all opposing the project and requesting a public hearing and an EIS [Environmental

21  Impact Statement]."  (FSC ¶ 22.)  Plaintiff also claims that FWS and EPA both "stressed the

22  need to fully assess the functional interrelationships of upland and wash habitats," and that

23  the agencies were denied the opportunity to review EA 2 before its release.  (FSC ¶ 22.)  For

24  relief, Plaintiff has requested: (1) a declaratory judgment that the Corps "violated NEPA and

25  Section 404 of the CWA in approving the Section 16 permit and underlying development

26  project without, *inter alia*, an EIS and adequate mitigation and public interest review"; (2)

27  that the Court set aside the Corps' decisions "as arbitrary, capricious, an abuse of discretion,

28  and not in accordance with law and procedures required" under 5 U.S.C. § 706(2)(A), (C)

1    and (D); (3) a permanent injunction against the Corps "from taking any steps to approve or

2    allow to commence or continue dredge and fill and any other activities directly or indirectly

3    dependent on [Corps] approval . . . anywhere on Section 16"; (4) Plaintiff's costs and

4    attorney's fees.  (FSC at 11-12.)

5           On March 2, 2006, Plaintiff filed a motion for a new TRO to restrain Lone Mountain

6    from activities outlined in the modified permit.  At a hearing on April 5, 2006, the Court

7    granted Plaintiff's motion for a TRO, and the subsequent Order restrained Defendants from

8    causing the discharge of dredge or fill materials into those portions of Section 16 determined

9    by the Corps to constitute jurisdictional waters of the United States.  At that same hearing,

10   the Court granted Plaintiff's motion to convert the motion for a TRO to a motion for a

11   preliminary injunction.  Two issues are now before the Court: Plaintiff's Motion for a

12   Preliminary Injunction and Lone Mountain's Motion to Dismiss.

13   **II.     LEGAL STANDARDS AND ANALYSIS**

14          **A.     Motion to Dismiss**

15          Lone Mountain has moved to dismiss this case pursuant to Rule 12(b)(1) of the

16   Federal Rules of Civil Procedure on the ground that this Court lacks subject matter

17   jurisdiction over the claims asserted.   "[W]hen considering a motion to dismiss pursuant to

18   Rule 12(b)(1) the district court is not restricted to the face of the pleadings, but may review

19   any evidence, such as affidavits and testimony, to resolve factual disputes concerning the

20   existence of jurisdiction." *McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir. 1988); *see*

21   *also Ass'n of Am. Med. Colls. v. United States*, 217 F.3d 770, 778 (9th Cir. 2000).  The

22   plaintiff has the burden of proving the existence of federal jurisdiction.  *Tosco Corp. v.*

23   *Cmtys. for a Better Env't*, 236 F.3d 495, 499 (9th Cir. 2001).

24          Lone Mountain argues that when the Corps issued EA 2 and a FONSI in October

25   2005, "a live controversy no longer existed between the parties."  (Mot. to Dismiss at 1.)

26   Alternatively, Lone Mountain argues that the FSC "fails to allege facts sufficient to support

27   Article III standing."  (Mot. to Dismiss at 2.)

28          **1.     Live Controversy**

1    Lone Mountain argues that Plaintiff's claims became moot when the Corps issued EA

2    2 and a FONSI in October 2005, which superseded and replaced EA 1, issued in 2002. (Mot.

3    to Dismiss at 1.)  Article III of the U.S. Constitution limits the jurisdiction of federal courts

4    to actual "cases" and "controversies," and precludes a court from taking action on a case once

5    it becomes moot.  *See Liner v. Jafco, Inc*., 375 U.S. 301, 306 n.3 (1964).  "A 'moot action'

6    is one where issues are no longer live or parties lack a legally cognizable interest in the

7    outcome."  *Murphy v. Hunt*, 455 U.S. 478, 481 (1982).   "The burden of demonstrating

8    mootness is a heavy one."  *Los Angeles County v. Davis*, 440 U.S. 625, 631 (1979) (citation

9    omitted); *Norman-Bloodsaw v. Lawrence Berkeley Lab*., 135 F.3d 1260, 1275 (9th Cir.

10   1998).  Generally, a case becomes moot when "(1) it can be said with assurance that there

11   is no reasonable expectation that the alleged violation will recur and (2) interim relief or

12   events have completely and irrevocably eradicated the effects of the alleged violation."  *Los*

13   *Angeles County*, 440 U.S. at 632 ("When both conditions are satisfied it may be said that the

14   case is moot because neither party has a legally cognizable interest in the final determination

15   of the underlying questions of fact and law.") A case is not moot if the court can provide any

16   effective relief, even if it is not the precise relief originally sought.  *See, e.g., Glickman v.*

17   *Wileman Bros. & Elliott, Inc*., 521 U.S. 457 (1997) (holding that the plaintiffs' challenge to

18   a generic advertising program was not mooted by discontinuation of the program because the

19   plaintiffs were seeking a refund for assessments against them for such advertising).

20   Plaintiff argues that Rule 15(d) of the Federal Rules of Civil Procedure allow it to

21   "correct jurisdictional defects . . . with subsequent facts or events." (Pl.'s Resp. in Opp'n to

22   Mot. to Dismiss ("Pl.'s Resp.") at 2.)  Rule 15(d) permits a "party to serve a supplemental

23   pleading setting forth transactions or occurrences or events which have happened since the

24   date of the pleading sought to be supplemented."  Fed. R. Civ. P. 15(d).  Permission to

25   supplement should be "freely granted where such supplementation will promote the

26   economic and speedy disposition of the controversy between the parties, will not cause undue

27   delay or trial inconvenience, and will not prejudice the rights of any other parties."

28   *Bornholdt v. Brady*, 869 F.2d 57, 68 (2d Cir. 1989).  The goal of Rule 15(d) is "to promote

1    judicial efficiency." *Planned Parenthood of S. Ariz. v. Neely*, 130 F.3d 400, 402 (9th Cir.

2    1997) (citing *Keith v. Volpe*, 858 F.2d 467, 473 (9th Cir. 1988)).

3              Lone Mountain argues that "none of the authorities cited by Plaintiff suggest that Rule

4    15 overrides Article III of the Constitution or otherwise provides a legitimate basis for

5    allowing a plaintiff to continue to prosecute a case that has become moot." (Lone Mountain's

6    Reply in Support of Mot. to Dismiss at 3.)  For support, Lone Mountain relies primarily on

7    *Environmental Protection Information Center, Inc. v. Pacific Lumber Co.* to argue that there

8    is no longer a live case or controversy before the Court.  (Mot. to Dismiss at 5 (citing *Envtl.*

9    *Prot. Info. Ctr. v. Pac. Lumber Co.*, 257 F.3d 1071, 1073 (9th Cir. 2001).)  In *Pacific*

10   *Lumber*, the defendant had applied to FWS and the National Marine Fisheries Service for an

11   Incidental Take Permit ("ITP") under ESA in order to log some of the defendant's holdings

12   in old growth forest.  Soon after the defendant filed its application, the plaintiffs filed suit

13   under Section 7(d) of ESA, 16 U.S.C. § 1536(d), which prohibits any irreversible or

14   irretrievable commitment of resources while consultation with FWS is taking place.  The

15   district court issued a TRO and then a preliminary injunction.  The court then held hearings

16   regarding the presence of coho salmon, a species covered by ESA, on the defendant's land.

17   Before the court issued its findings of fact and conclusions of law, the agencies involved

18   issued a biological opinion and ITP to defendant.  The court then held a hearing on the

19   defendant's motion to dismiss based on the defendant's assertion that the issuance of the ITP

20   and biological opinion mooted the case because there was no longer an ongoing consultation

21   with FWS.  On the same day it heard arguments on the defendant's motion to dismiss, the

22   district court issued its findings of fact and conclusions of law with respect to the preliminary

23   injunction and the presence of coho salmon in certain watersheds and streams on the

24   defendant's property.  Two months later, the district court granted the defendant's motion to

25   dismiss and dissolved the preliminary injunction on the grounds that the issuance of the ITP

26   mooted the case.

27             The defendant appealed, asking the Ninth Circuit to vacate the order and statements

28   filed by the district court after the case had become moot and which outlined the reasons why

1  the district court granted a preliminary injunction.  While the parties agreed "that the district
2  court lost jurisdiction with the issuance of the biological opinion," the plaintiffs argued that
3  the defendant lacked standing to appeal because the lower court's final judgment "was
4  entirely in [the defendant's] favor."  *Id.* at 1073.  Thus, the issue before the Ninth Circuit was
5  whether the defendant was an "aggrieved" party with standing, despite the favorable
6  judgment in the court below.  The court of appeals, finding only one Third Circuit case on
7  point and determining that it should follow the Third Circuit rather than create an
8  "intercircuit conflict," held that "the district court's decision to flout the dictates of Article
9  III and render an opinion in spite of knowing the cause was moot did render [the defendant]
10  an 'aggrieved party.'"  *Id.* at 1077 (noting that even "dicta entered after a court has lost
11  jurisdiction over a party inflicts a wrong on that party of a different order than that which
12  exists in the usual case of extraneous judicial pronouncement.")

13          *Pacific Lumber* is not on point here.  The issue before the Ninth Circuit was whether
14  the defendant was an "aggrieved" party with standing to request that the court of appeals
15  vacate statements made by the lower court after it had rendered a decision in the defendant's
16  favor.  The court answered in the affirmative and remanded to the lower court to vacate its
17  order rendered after the case had become moot.   Here, the Court has not issued a decision
18  in Defendants' favor and then made statements which have no impact on the case.  Rather,
19  the Court has merely said that with the issuance of EA 2, the questions surrounding EA 1
20  became moot.  Nor have the parties agreed that this Court has lost jurisdiction with the
21  issuance of EA 2 as the parties had in *Pacific Lumber*.  It would hardly serve the  goal of
22  judicial efficiency if the Court dismissed the case entirely and required Plaintiff to file an
23  entirely new Complaint based on the very same issues.  The basis of any newly-filed
24  complaint would still be that the Corps did not properly conduct its EA, and Plaintiff's claims
25  and demands for relief would presumably remain the same.  In addition, the  same permit that
26  precipitated this litigation in 2002, although now modified, has been reissued.  Therefore,
27  there remains a case or controversy before the Court, and the case is not moot.

28          **2.      Standing**

1    Lone Mountain also argues that Plaintiff lacks standing to bring suit on behalf of its

2  members.  (Mot. to Dismiss at 8.)  Lone Mountain contends that "the interest of SOS and its

3  members is based on past recreational activities while the Property was owned by the State

4  and ownership of land somewhere near the Property.  There are no allegations describing

5  how the challenged agency action, i.e., the Corps' issuance of a permit under the CWA,

6  affects these interests in any tangible way."  (Mot. to Dismiss at 11.)  In particular, Lone

7  Mountain asserts that the FSC "fails to contain any allegations describing a legitimate interest

8  in those [jurisdictional] washes or how any of SOS's members are injured in a concrete and

9  personal way by the Corps' issuance of the permit."  (Mot. to Dismiss at 12.)  Lone Mountain

10  continues, "At best, the Supplemental Complaint asserts a generalized grievance regarding

11  the State's decision to sell the Property in 2001 to a private real estate developer and, more

12  broadly, the urbanization that has taken place during the past decade, which has reduced open

13  space and recreational opportunities in that portion of Phoenix."  (Mot. to Dismiss at 12.)

14    Plaintiff submitted two declarations with its response from SOS members attesting

15  that they own property a block or two from Section 16, and that Lone Mountain's

16  development would negatively affect them.  The two members say certain washes that run

17  through their properties also flow into Section 16.  (Decl. of Linda Bentley ("Bentley Decl.")

18  at ¶ 4; Decl. of Michael Feibus at ¶ 4.)  One member says "[t]he washes running through my

19  property and Section 16 also contribute to the lush desert flora and the presence of fauna on

20  my property and to the aesthetics and value of my property."  (Bentley Decl. at ¶ 6.)

21    During the proceedings related to EA 1, the Ninth Circuit held that SOS members who

22  submitted declarations similar to Bentley's and Feibus's had standing.  *See Save Our Sonoran*,

23  408 F.3d at 1120-21.  Five SOS members in all submitted affidavits in 2002: Cynthia Foster,

24  Gail Dudley, Julia Broccardo, Anita Carr, Nancy L. Whiting, and Susan Kantrowitz.  At the

25  April 5, 2006 hearing on Lone Mountain's Motion to Dismiss, Lone Mountain pointed out

26  that the new declarations filed with Plaintiff's opposition to the motion to dismiss were not

27  by the same people whom the Ninth Circuit had previously held had individual standing.

28  Lone Mountain said it would challenge whether the two new declarations conferred standing

1   on SOS, but said it would concede standing if the same people who filed affidavits in the

2   original action have not moved and have the same interest in Section 16 that they had in

3   2002.  (Tr. 69:6-19.)  The Court said the standing issue would be resolved if the original

4   declarants are still members of SOS and live in the same place they did in 2002.  (Tr. 74:19-

5   25, 75:1.)

6          Plaintiff has since submitted a declaration by one of the original five declarants stating

7   that she is still a member of SOS, resides at the same address, and that the statements set

8   forth in her original affidavit remain true and unchanged.  (Decl. of Nancy Whiting dated

9   April 6, 2006 ("Whiting Decl.") at ¶¶ 1-4.)  In her original affidavit, Whiting said she lives

10  and owns property within one-quarter mile of Section 16, which she and her family and

11  neighbors used for recreational purposes, that Lone Mountain's proposed developed "will

12  destroy the quality of these experiences," destroy the rural setting, and devalue her property.

13  (Aff. of Nancy I. Whiting dated May 21, 2002 ("Whiting Aff.") at 1.)  Whiting said, "most

14  importantly, because of the surrounding development on all sides of Section 16, the native

15  wildlife and natural vegetation within Section 16 will be totally destroyed.  The devastation

16  of Section 16 will negatively effect [sic] the environment by eliminating nature's balance for

17  miles around this area."  (Whiting Aff. at 1.)  Because Ms. Whiting has now affirmed the

18  statements she made in her original affidavit, she has individual standing.  Likewise, because

19  at least one member of SOS who filed an affidavit in the initial proceeding still has standing,

20  SOS itself has standing.  Lone Mountain has conceded the standing issue because at least one

21  member of SOS still lives in the same place she did in 2002.

22         Because the Court has found that this case is not moot and that Plaintiff has standing,

23  Lone Mountain's Motion to Dismiss is denied.

24         **B.     Preliminary Injunction**

25         Plaintiff has now moved for a preliminary injunction against the modified Permit

26  2000-01928-RWF ("the Permit").  In its motion for a TRO, now converted to a motion for

27  a preliminary injunction, Plaintiff sought to restrain "any and all activities pursuant to [the

28  Permit], including actions in furtherance of the broader development project facilitated by

1    the permit, throughout all of the affected area known as Section 16 . . . ."  (Pl.'s Mot. for

2    Temporary Restraining Order ("Mot. for TRO") at 11.)  Specifically, Plaintiff requested a

3    restraint on any dredge and fill activities in the washes on Section 16, and "any development-

4    related activity on Section 16" including "vegetation removal, road placement, blading,

5    bulldozing and other pre-construction activity, and any and all construction activity." (Mot.

6    for TRO at 11.)  The Court granted Plaintiff's motion for a TRO, which will remain in effect

7    until the Court rules on this motion for a preliminary injunction.  The Court ordered that

8    Defendants "are temporarily restrained from authorizing or engaging in activities causing the

9    discharge of dredge or fill materials within those portions of [Section 16] determined by the

10   Corps to constitute jurisdictional 'waters of the United States' within the meaning of the

11   Clean Water Act."  (Order dated April 27, 2006.)

12                      **1.      Preliminary Injunction Standard**

13          The Ninth Circuit has described two alternative sets of criteria for preliminary

14   injunctive relief.  *See Save Our Sonoran*, 408 F.3d at 1120.  The "traditional" criteria require

15   a plaintiff to show "'(1) a strong likelihood of success on the merits, (2) the possibility of

16   irreparable injury to plaintiff if preliminary relief is not granted, (3) a balance of hardships

17   favoring the plaintiff, and (4) advancement of the public interest (in certain cases).'"  *Id.*

18   (quoting *Johnson v. Cal. State Bd. of Accountancy*, 72 F.3d 1427, 1430 (9th Cir. 1995)).

19   Alternatively, a party is entitled to a preliminary injunction if it can show either: "(1) a

20   likelihood of success on the merits and the possibility of irreparable injury; or (2) the

21   existence of serious questions going to the merits and the balance of hardships tipping

22   sharply in [the movant's] favor.  *MAI Sys. Corp. v. Peak Computers, Inc.,* 991 F.2d 511, 516

23   (9th Cir. 1993) (internal quotations and citations omitted).

24          The *Peak Computers* standard is a sliding scale in which the required degree of

25   irreparable harm increases as the probability of success decreases.  *Diamontiney v. Borg,* 918

26   F.2d 793, 795 (9th Cir. 1990).  Thus, if a party can show a strong chance of success on the

27   merits, he need only show a possibility of irreparable harm.  *Peak Computers,* 991 F.2d at

28   517 (internal quotations and citations omitted).  Where, on the other hand, a party can show

1   only that serious questions are raised, he must show that the balance of hardships tips sharply

2   in his favor.  *Id.*

3        Plaintiff offers several reasons for why the Court should issue a preliminary

4   injunction.  First, Plaintiff argues that EA 2 does not adequately address the concerns raised

5   by FWS or ESA, which Plaintiff contends, on information and belief, "continue to consider

6   [EA 2] to be inadequate under NEPA."  (Mot. for TRO at 5.)  Second, Plaintiff takes issue

7   with the Corp's assessment that impacts to wildlife would be minimal.  (Mot. for TRO at 5-

8   6.)  Third, Plaintiff argues that the Corps should have looked at the impact on the local

9   community of Volatile Organic Compounds ("VOCs") and Carbon Monoxide ("CO")

10  emissions from the increased traffic resulting from the development, and not just the impact

11  on Maricopa County.  (Mot. for TRO at 6.)  Finally, Plaintiff argues that the Corps failed to

12  assess the local impacts of growth, land use patterns and habitat loss, and instead only looked

13  at the impacts on the State of Arizona and Maricopa County.  (Mot. for TRO at 6-7.)

14  Plaintiff raises additional concerns in the Motion related to compensatory mitigation for the

15  removal of upland vegetation and whether the Corps used up-to-date "drainage/flood date

16  in reaching its conclusions."  (Mot. for TRO at 7.)

17       In its Reply to Lone Mountain's Response, Plaintiff argues further that the Corps

18  should have prepared a detailed EIS because "(1) the project at issue may have a significant

19  impact on the quality of the human environment, i.e., an EIS should have been prepared;

20  and/or (2) the expanded EA was inadequate in its own right."  (Pl.'s Reply at 3.)  Plaintiff

21  also argues in its Reply that the Corps failed to provide a thirty-day public comment period

22  on the FONSI before finalizing its action.  (Pl.'s Reply at 10-11.)

23                    **2.    Standard of Review**

24       Plaintiff's action challenges the adequacy of the Corps' NEPA analysis.   "The

25  Administrative Procedure Act ("APA") governs judicial review of agency decisions under

26  NEPA."  *Anderson v. Evans*, 371 F.3d 475, 486 (9th Cir. 2004).  Under the APA, a reviewing

27  court must set aside agency action found to be "arbitrary, capricious, an abuse of discretion,

28  or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  The court must also set

1    aside agency action that is "in excess of statutory jurisdiction, authority, or limitations, or

2    short of statutory right," or "without observance of procedure required by law." *Id.* §

3    706(2)(C)-(D).  In applying the "arbitrary or capricious" standard, "the reviewing court 'must

4    consider whether the decision was based on a consideration of the relevant factors and

5    whether there has been a clear error of judgment.'" *Marsh v. Or. Natural Res. Council*, 490

6    U.S. 360, 378 (1989) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S.

7    402, 415 (1971)).  "Although this inquiry into the facts is to be searching and careful, the

8    ultimate standard of review is a narrow one. The court is not empowered to substitute its

9    judgment for that of the agency." *Overton Park*,  401 U.S. at 416, *overruled on unrelated*

10   *grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977).

11                      **3.      National Environmental Policy Act**

12        "Congress, through NEPA, imposed procedural requirements on federal agencies

13   designed to force an agency to consider the environmental consequences of its proposed

14   activity." *Sierra Club v. Babbitt*, 65 F.3d 1502, 1505 (9th Cir. 1995).  "A section 404 permit

15   issued by the Corps is a 'Federal action' to which NEPA applies." *Save Our Sonoran*, 408

16   F.3d at 1121 (citing *Tillamook County v. U.S. Army Corps of Eng'rs*, 288 F.3d 1140, 1142

17   (9th Cir. 2002)).

18        Under NEPA, a federal agency must "produce an environmental impact statement

19   ('EIS') when proposing to engage in an action that will significantly affect the human

20   environment." *Id.* (citing 42 U.S.C. § 4332(2)(C)).[2]  Generally, though, an agency will first

21

22            [2]The regulations define "significantly" in terms of both context and intensity.  40

23   C.F.R. § 1508.27.  The contextual inquiry means that "the significance of an action must be

24   analyzed in several contexts such as society as a whole (human, national), the affected

     region, the affected interests, and the locality. Significance varies with the setting of the

25   proposed action. For instance, in the case of a site-specific action, significance would usually

     depend upon the effects in the locale rather than in the world as a whole. Both short- and

26   long-term effects are relevant." *Id.* § 1508.27(a).  "Intensity . . . refers to the severity of

27   impact. . . ." *Id.* § 1508.27(b).  In evaluating intensity, the regulations list a number of

     considerations including "both beneficial and adverse" impacts, "[t]he degree to which the

28   proposed action affects public health or safety," "unique characteristics of the geographic

prepare an EA to determine whether an EIS is required. *Sierra Club*, 65 F.3d at 1505 (noting that if the proposed action "will significantly affect the human environment, an EIS is required") (citing 42 U.S.C. § 4332(2)(C) and 40 C.F.R. § 1501.4).   An EA is a "concise public document" that "[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an [EIS] or a [FONSI]."  40 C.F.R. § 1508.9(a)(1).  An EA must "include brief discussions of the need for the proposal, of alternatives [to the proposal], of the environmental impacts of the proposed act and alternatives, and a listing of agencies and persons consulted."  40 C.F.R. § 1508.9(b).  If an EIS is not required, the agency must issue a FONSI.  40 C.F.R. § 1501.4(e).  The agency must include with the FONSI "a convincing statement of reasons to explain why a project's impacts are insignificant." *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 730 (9th Cir.  2001) (internal citations and quotations omitted).

When an agency decides not to prepare an EIS, "the decision not to do so may be overturned only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Anderson*, 371 F.3d at 486.  A court reviewing an agency's compliance with NEPA must ensure "that the agency has taken a 'hard look' at [the] environmental consequences" of the proposed agency action.  *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 21 (1976).  *See also Wetlands Action Network v. U.S. Army Corps of Eng'rs*, 222 F.3d 1105, 1114 (9th Cir. 2000) ("The arbitrary and capricious standard requires a court to ensure that an agency has taken the requisite 'hard look' at the environmental consequences of its proposed action, carefully reviewing the record to ascertain whether the agency decision is founded on a reasoned evaluation of the relevant factors.") (citations and internal quotations omitted); *Nat'l Parks*, 241 F.3d at 730.  "The court must defer to an agency conclusion that is fully informed and well-considered, but need not rubber stamp a clear error of judgment." *Anderson*, 371 F.3d at 486 (internal quotations and citations omitted).

---

area,"and "cumulative impacts" when considered along with related actions.  *Id.* § 1508.27(b)(1-3, 7).

1

### 4.      The Clean Water Act

Section 404 of the CWA authorizes the Corps to regulate and issue federal permits "for the discharge of dredged or fill material into the navigable waters at specified disposal sites."  33 U.S.C. § 1344(a).  "Navigable waters," defined by Congress as "waters of the United States," can include "intermittent streams," "natural ponds," and tributaries of navigable waters.  33 U.S.C. § 1362(7) and 33 C.F.R. § 328.3(a).  *See, e.g., United States v. Phelps Dodge Corp*., 391 F. Supp. 1181, 1187 (D. Ariz. 1975) (holding that "navigable waters" include "normally dry arroyos through which water may flow, where such water will ultimately end up in public waters such as a river or stream, tributary to a river or stream, lake, reservoir, bay, gulf, sea or ocean within or adjacent to the United States"); *Quivira Min. Co. v. U.S. E.P.A.*, 765 F.2d 126, 129 (10th Cir. 1985) (holding that gully that flowed into a navigable stream after intense rain was a water of the United States).

A "discharge" is defined as "any addition of any pollutant to navigable waters from any point source."  33 U.S.C. § 1362(12) and (16).  "Dredged material" is "material that is excavated or dredged from waters of the United States."  33 C.F.R. § 323.2(c).  "Fill material" includes "replacing any portion of a water of United States with dry land; or changing the bottom elevation of any portion of a water of the United States."  *Id.* § 323.2(e)(1)(i)-(ii).

The parties do not contest the Corps' determination that the washes at issue in this case are navigable waters and thus under the jurisdiction of the federal government, or that development impacting those jurisdictional washes requires a CWA Section 404 permit. The issue, rather, is the scope of the Corps' EA analysis under NEPA outside of the washes themselves.

The Corps' NEPA implementing regulations govern the Corps' scope of analysis. Under those regulations, the Corps "is considered to have control and responsibility for portions of the project beyond the limits of Corps jurisdiction where the Federal involvement is sufficient to turn an essentially private action into a Federal action.  These are cases where the environmental consequences of the larger project are essentially products of the Corps

permit action." 33 C.F.R. Pt. 325, App. B, § 7(b)(2).  The regulations outline typical factors to consider when determining whether sufficient "control and responsibility" exists, including,

> (i)  Whether or not the regulated activity comprises "merely a link" in a corridor type project (e.g., a transportation or utility transmission project).
>
> (ii)  Whether there are aspects of the upland facility in the immediate vicinity of the regulated activity which affect the location and configuration of the regulated activity.
>
> (iii)  The extent to which the entire project will be within Corps jurisdiction.
>
> (iv)  The extent of cumulative Federal control and responsibility.

*Id.*

As the district court previously found, "the development of the entire section with 794 houses is directly dependent upon, and the product of, the Corps' permit action.  Without a permit to allow for 66 separate and dispersed crossings, the private project could not go forward."  *Save Our Sonoran*, 227 F. Supp. 2d at 1114 (finding that there were "serious questions as to whether the Corps had correctly confined its analysis").  In holding that the lower court did not abuse its discretion, the Ninth Circuit observed that the Corps "has responsibility under NEPA to analyze all of the environmental consequences of a project." *Save Our Sonoran*, 408 F.3d at 1122.  Thus, "while it is the development's impact on jurisdictional waters that determines the scope of the Corps' permitting authority, it is the impact of the permit on the environment at large that determines the Corps' NEPA responsibility," which "extends even to environmental effects with no impact on jurisdictional waters at all."  *Id.*  As the Ninth Circuit held, "Lone Mountain cannot begin developing any portion of the land in the absence of an appropriately broad NEPA analysis by the Corps."  *Id.*

      **5.**    **EA 2**

1    The original district court opinion granting the first preliminary injunction states: "A
2    single issue dominates the merits of the claims and the defenses.  Plaintiff claims that the
3    Corps of Engineers' Environmental Assessment was too narrow in scope.  The Corps simply
4    looked at the washes *and not the remainder of the section* and found that there was no
5    significant impact under [NEPA]."   *Save Our Sonoran*, 227 F. Supp. 2d at 1113 (emphasis
6    added).  The court focused almost exclusively on the section of EA 1 discussing the Corps'
7    scope of analysis under NEPA and found that EA 1's scope of analysis "raises substantial
8    questions" because it was so narrowly focused.  *Id.* at 1114.  The district court concluded its
9    order granting Plaintiff's motion for a preliminary injunction by encouraging the Corps "to
10   consider the preparation of a new Environmental Assessment with a scope of analysis under
11   [NEPA] as though federal action included the entire project on all of section 16."  *Id.* at 1115.
12   The Ninth Circuit held that the district court did not abuse its discretion or base its decision
13   on an erroneous legal standard or on clearly erroneous findings of fact.  *Save our Sonoran*,
14   408 F.3d at 1121 ("The district court correctly held that the Corps had improperly
15   constrained its NEPA analysis to the washes, rather than considering the development's effect
16   on the environment as a whole.").

17   The Corps has now prepared EA 2, and it is this Court's job to determine whether EA
18   2 satisfies the requirements of NEPA and CWA.

19   In EA 1, a 35-page document, the Corps' discussion of its scope of analysis concluded:

20   [T]he Federal involvement in this project is not sufficient to
21   extend the scope of analysis to the entire Lone Mountain site.
22   The environmental consequences of the larger project are not
23   essentially the products of the Corps' permit action.  The Corps'
24   scope of analysis for this permit action is the area of direct
25   impact to waters of the U.S., plus the immediately adjacent
26   upland areas where the upland activity is a direct result of the
27   permitted activity, plus the immediately contiguous upstream

28

1    and downstream washes that might be indirectly affected by

2    work in waters of the U.S.

3  (EA 1 at 3-4.)

4        EA 2, now a 79-page document plus attachments, begins with a history of the

5  controversy and explains:

6              While the Corps believes the scope of analysis for the Decision

7              Document dated March 1, 2002 is appropriate and in accordance

8              with its regulations and existing case law interpreting the

9              application of those regulations, this expanded EA has been

10             prepared in response to the court's recommendation, with the

11             concurrence of Lone Mountain, in the interest of avoiding

12             further litigation and for the purpose of determining whether to

13             reinstate, modify or revoke the permit.   The scope of the

14             analysis for the expanded EA is the entire 608-acre development

15             site owned by Lone Mountain.   This expanded assessment is

16             based upon the Corps' knowledge of the project area and

17             vicinity, comments that were received in response to the June 1,

18             2001 and June 6, 2005 public notices, information received from

19             Jones & Stokes and WestLand Resources, Inc. on behalf of the

20             applicant, and specific concerns identified in connection with

21             the aforementioned litigation.

22  (EA 2 at 3.)

23       Plaintiff's motion lists four primary arguments for why EA 2 is deficient: (1) that the

24  Corps did not adequately address the concerns raised by EPA and FWS; (2) that the Corps'

25  discussion of wildlife impacts is inadequate; (3) that the Corps failed to assess various local

26  impacts such as land use patterns and increased emissions of VOCs and CO; and (4) that the

27  Corps failed to adequately discuss compensatory mitigation. (Mot. for TRO at 5-7.) Plaintiff

28  also argued at the hearing that the Corps was obligated to submit a draft EA for comment

1    before its final publication.  The Court will discuss each of these issues in turn beginning

2    with the public comment argument.

3                    **a.      Comment Period on Draft EA**

4            At the hearing, Plaintiff argued that the Corps violated NEPA by failing to hold a

5    public comment period on a draft of EA 2 prior to issuing the final version.  (Tr. 15:10-11.)

6    Plaintiff said the Corps merely announced in advance that it was going to prepare an

7    expanded EA, but that no one got to review the expanded EA before it was issued.  (Tr.

8    16:10-16.)  Plaintiff argued that Executive Order ("EO") 11,988 and guidance from the

9    Council on Environmental Quality ("CEQ") require a public comment period on a draft EA

10   when the proposed federal action is located on a floodplain, and that Ninth Circuit case law

11   requires a public comment period regardless of whether the action is on a floodplain.  (Tr.

12   15:13-24 (citing *Anderson v. Evans*, 371 F.3d 475 (9th Cir. 2004).)

13           If an agency decides to allow a project to take place in a floodplain, EO 11,988 states

14   that the agency must "prepare and circulate a notice containing an explanation of why the

15   action is proposed to be located in the floodplain" and "provide opportunity for early public

16   review of any plans or proposals for actions in floodplains . . . ."  Exec. Order No. 11,988

17   Sec. 2(a)(2)(ii) & 2(a)(4), 42 Fed. Reg., 26,9511 (May 24, 1977). "Floodplain" is defined as

18   "the lowland and relatively flat areas adjoining inland and coastal waters including flood

19   prone areas of offshore islands, including at a minimum, that area subject to a one percent

20   or greater chance of flooding in any given year."  *Id.* Sec. 6(c).

21           It is not clear from the record that Section 16 is in a floodplain.  Plaintiff says

22   "Obviously, the project is located in and around wetlands/floodplains."  (Pl.'s Reply to Lone

23   Mountain's Resp. at 9.)   But saying that Section 16 is in a floodplain subject to EO 11,988

24   does not make it so.  Plaintiff has only directed the Court to page 55 of EA 2, which says "the

25   southeastern portion of [Section 16], near 64th Street, is located within a FEMA-mapped AO

26   flood zone.  Lone Mountain has stated that the project design in this AO floodplain area

27   meets the City of Phoenix requirements for construction in an AO zone."  (EA 2 at 55.)

28   However, Plaintiff has pointed to nothing in the record indicating that Section 16 is in the

1    "lowland and relatively flat areas adjoining inland and coastal waters" and "subject to a one

2    percent or greater chance of flooding in any given year," as defined in EO 11,988.

3         Plaintiff also cited dicta from *Anderson v. Evans* for the proposition that the Corps

4    was required to submit the EA and FONSI for public comment prior to its final publication.

5    371 F.3d at 487 ("The public must be given an opportunity to comment on draft EAs and

6    EISs . . . ."). In a subsequent Ninth Circuit case, the court held that "Although we have not

7    established a minimum level of public comment and participation required by the regulations

8    governing the EA and FONSI process . . . a complete failure to involve or even inform the

9    public about an agency's preparation of an EA and a FONSI . . . violates these [the CEQ's]

10   regulations." *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 97o (9th Cir.

11   2003) (citations omitted). That is not the situation before this Court. The Corps has opened

12   public comment periods twice on the very same proposed project, first in 2001 and then in

13   2005. EA 2 summarizes and responds to the comments made by other agencies and the

14   public during both public comment periods. Pages 42 to 59 address the comments made in

15   2001 prior to the issuance of EA 1. Pages 59 to 71 addresses the comments submitted in

16   June 2005. Thus, the Corps has fulfilled the purpose of NEPA by including the public in the

17   process and there is no procedural injury. *See id.* ("[T]he purpose of NEPA . . . is to ensure

18   that federal agencies are informed of environmental consequences before making decisions

19   and that the information is available to the public.") (citation and quotations omitted).

20                          **b.      EPA and FWS Concerns**

21        Plaintiff argues that the Corps did not adequately address the concerns raised by FWS

22   and EPA, which Plaintiff contends, on information and belief, "continue to consider [EA 2]

23   to be inadequate under NEPA." (Mot. for TRO at 5.)

24        Plaintiff also argued at the hearing that the Corps failed to follow its own regulations

25   by not adequately consulting and considering FWS's comments to EA 2.[3] (Tr. 20:13-18.)

26

27   ───────────────

28        [3]Plaintiff submitted a letter from FWS dated December 13, 2005 in support of its
     motion for a TRO. The Court will not consider this letter as it is outside of the administrative

1   Plaintiff directed the Court to 33 C.F.R. § 320.4(c), which requires the Corps to consult with

2   FWS and its state counterpart "with a view to the conservation of wildlife resources by

3   prevention of their direct and indirect loss and damage due to the activity proposed in a

4   permit application. The Army will give full consideration to the views of those agencies on

5   fish and wildlife matters in deciding on the issuance, denial, or conditioning of individual or

6   general permits."

7        Section 7 of ESA prohibits a federal agency from authorizing, funding, or carrying

8   out any action that is "likely to jeopardize the continued existence of any endangered or

9   threatened species or result in the destruction or adverse modification of habitat of such

10  species . . . ." 16 U.S.C. § 1536(a)(2).  If the agency determines its action may affect listed

11  species or critical habitat, then it must undertake a "formal consultation" with FWS.  50

12  C.F.R. § 402.14(a).  The consultation process allows the FWS "to determine whether the

13  federal action is likely to jeopardize the survival of a protected species or result in the

14  destruction or adverse modification of its critical habitat and, if so, to identify reasonable and

15  prudent alternatives which will avoid the action's unfavorable impacts." *Sierra Club,* 65 F.3d

16  at 1505 (citing 16 U.S.C. § 1536(b)(3)(A)).

17       In EA 2, the Corps determined:

18            No federally listed threatened or endangered aquatic or upland

19            species or designated critical habitat occurs on or in the vicinity

20  _____

21  record.  *See Southwest Ctr. for Biological Diversity v. United States*, 100 F.3d 1443, 1450
22  (9th Cir. 1996) ("Judicial review of an agency decision typically focuses on the
    administrative record in existence at the time of the decision and does not encompass any
23  part of the record that is made initially in the reviewing court.") (citing *Camp v. Pitts*, 411
    U.S. 138, 142 (1973); *Nevada Land Action Ass'n v. U.S. Forest Serv.*, 8 F.3d 713, 718 (9th
24  Cir. 1993)).  In *Southwest Center*, the court said materials outside the administrative record
25  may be reviewed "(1) if necessary to determine whether the agency has considered all
    relevant factors and has explained its decision, (2) when the agency has relied on documents
26  not in the record, or (3) when supplementing the record is necessary to explain technical
    terms or complex subject matter." *Id.* (citations and internal quotations omitted) (noting that
27  the Court may also consider such materials "when plaintiffs make a showing of agency bad
28  faith.").  None of these situations are present in this case.

1    of the subject property.  Neither the permit action nor the

2    planned development would affect any species listed as

3    endangered or threatened or their critical habitat, pursuant to

4    [ESA].  Therefore, consultation with the FWS is not required.

5  (EA 2 at 12.)  Because no threatened or endangered species or designated critical habitat

6  were found, the Corps was not obligated to undertake formal consultation with FWS.  This

7  is confirmed by EA 2's discussion of threatened or endangered species[4] and critical habitat

8  on pages 28-29, 41, 43-44, 46, 54, 55-56, 66.

9    Plaintiff argues that "The Ninth Circuit states that it is 'significant' that both . . . EPA,

10  and . . . FWS disagree with the analysis in [EA 1]."  (Mot. for TRO at 5.)  What the Ninth

11  Circuit said is, "It is significant at the onset to recall that two federal agencies, the EPA and

12  the FWS – not the usual suspects in opposing the action of a federal agency – disagreed with

13  the acreage limitations set forth in the permit applications and thus with the Corps'

14  interpretation of its NEPA responsibility. . . ."  *Save Our Sonoran*, 408 F.3d at 1122.  The

15  court of appeals made this observation in upholding the district court's determination that the

16  Corps violated NEPA "by failing to conduct an appropriately broad NEPA analysis."  *Id.*  In

17  EA 2, the Corps addressed these concerns and broadened its NEPA analysis to the entirety

18  of Section 16, and no longer confined its analysis to those aspects of the project with direct

19  impacts to jurisdictional waters, the immediately adjacent upland areas, and the immediately

20  contiguous upstream and downstream washes that might be indirectly affected.  Therefore,

21  EA 2 has addressed this concern of FWS, EPA and the court of appeals by broadening its

22  NEPA analysis to the entire site.

23

24  _____

25    [4]FWS's previous concerns appeared to focus primarily on the disturbance of potential
     habitat for the cactus ferruginous pygmy owl ("CFPO").  EA 2 says that surveys for CFPO
26   have been conducted four times on Section 16 between 2000 and 2004, and "no CFPO were
     identified during any [of] these intensive field surveys."  (EA 2 at 29.)  Nor is Section 16
27   "included within a recovery area identified under FWS's draft recovery plan for the pygmy-
28   owl."  (EA 2 at 66.)

1    Moreover, EA 2 addresses EPA's comments on pages 42, 50-51, 60, and 64-65, and

2    it addresses FWS's comments on pages 42-46, 52-54, 60 and 65. EA 2 reflects the Corps'

3    consideration of EPA's and FWS's opinions.  Thus, although FWS and EPA may still

4    disagree with the Corps' analysis, the Corps' NEPA obligation is satisfied when it

5    "consider[s] and respond[s] to the comments of other agencies." *Arkansas Wildlife Fed'n v.*

6    *U.S. Army Corps of Eng'rs*, 431 F.3d 1096, 1101 (8th Cir. 2005); *Hells Canyon Pres. Council*

7    *v. Jacoby*, 9 F. Supp. 2d 1216, 1242 (D. Or. 1998) ("An agency is required to consider the

8    comments of other agencies, but it does not have to defer to them when a disagreement

9    exists.") (citations omitted).

10                                **c.    Wildlife Impacts**

11    EA 2 discusses issues related to wildlife in general at pages 11-14, 27-29, 38-39, 52-

12    56, and 64.  Plaintiff disagrees with EA 2's analysis that "because of past disturbance and the

13    'fragmented' nature of the site, impacts to wildlife will be minimal."  (Mot. for TRO at 5

14    (citing EA 2 at 39).)  The Corps determined that within Section 16 "urban wildlife habitats

15    would be adversely impacted by the proposed development," but that "on a regional or

16    statewide scale, these impacts are not considered cumulatively significant."  (EA 2 at 39.)

17    EA 2 observes that Section 16 is "in the center of an area in which the majority of upland

18    habitat has already been fragmented or otherwise altered from prior development activity."

19    (EA 2 at 38.)  EA 2 notes that while "364 acres of Sonoran Desert Scrub habitat would be

20    lost" by the proposed development, "approximately 244 acres of natural undisturbed open

21    space would remain upon completion of the entire project."  (EA 2 at 38.)

22    While Plaintiff may disagree with the Corps' assessment, the Court cannot say that

23    the Corps has not "considered the relevant factors and articulated a rational connection

24    between the facts found and the choices made." *Baltimore Gas & Elec. Co. v. Nat'l Res. Def.*

25    *Council, Inc*., 462 U.S. 87, 103 (1983).

26                         **d.    Increased Emissions and Other Local Impacts**

27    Plaintiff contends that while EA 1 concluded "VOC and CO emissions from Lone

28    Mountain traffic would not be a significant source of VOCs or CO on a County-wide basis",

1    the Corps was obligated to provide "analysis of the contribution of VOCs and CO from Lone

2    Mountain traffic on the local/impacted community and/or the Cave Creek area." (Mot. for

3    TRO at 6 (citing EA 1 at 20).)  Plaintiff also argues that the Corps' analysis is deficient when

4    it discusses "growth, land use patterns, and habitat loss" and "fails to provide any meaningful

5    baseline data regarding the impacted community."    (Mot. for TRO at 6.)

6          Under CEQ's regulations, in analyzing the "significance" of the proposed federal

7    action, the Corps is to consider both the context and intensity of the action.  *See* 40 C.F.R.

8    § 1508.27.  EA 2 provides analysis of both the context and the intensity of Lone Mountain's

9    proposed action.  It discusses the project context in terms of waters of the U.S. as well as

10   growth, land use patterns, and habitat loss and the cumulative effects within and outside of

11   Section 16.  (*See* EA 2 at 30-40.)  The analysis summarizes indirect and cumulative effects

12   from the proposed permit action by "following the requirements of NEPA and of the CEQ's

13   and the Corps' regulations and policy . . . to place the consequences of the permit action and

14   development into the context of other past actions, present actions, or reasonable future . .

15   . actions . . . ."   (EA 2 at 30.)  The discussion begins by looking at State and County land

16   use patterns and then focuses specifically on Section 16 beginning on page 35.  In discussing

17   cumulative impacts, EA 2 notes that "projecting future impacts based upon the number of

18   building permits issued annually in Maricopa County, the project again is a relatively

19   insignificant component of the anticipated growth in Maricopa County and thus associated

20   impacts to vegetation and wildlife." (EA 2 at 39.)

21         The reviewing court must "defer to an agency's determination of the scope of its

22   cumulative effects review."  *Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059,

23   1071 (9th Cir. 2002) (citing *Kleppe*, 427 U.S. at 413-14).  Here, the Corps has analyzed the

24   cumulative effects at the State, County and local level and reached the conclusion that those

25   effects would be insignificant.  The decision appears fully informed and well-considered,

26   and, thus, the Corps has fulfilled its NEPA obligation in discussing the significance of the

27   proposed federal action.

28                      **e.    Compensatory Mitigation**

1    Plaintiff's final argument takes issue with the Corps' determination that "[n]o
2    compensatory mitigation would be required by the Section 404 permit for the removal of
3    upland vegetation during project development."  (EA 2 at 24.)  Plaintiff believes that
4    "mitigation of such impacts should be discussed and provided as part of [EA 2]."  (Mot. for
5    TRO at 7.)  Lone Mountain argues that the Corps "lacks legal authority to impose mitigation
6    requirements based on activities outside the Corps' jurisdiction."  (Lone Mountain's Resp. at
7    15 (citing *Mango*, 199 F.3d at 93 and n.7).)  In *Mango*, the court held that "permit conditions
8    are valid if they are reasonably related to the discharge, whether directly or indirectly."

9    EA 2 does discuss mitigation requirements at pages 40-41, and the modified permit
10   imposes specific mitigation requirements.  Those requirements reasonably relate to the
11   permitted discharge and are within the Corps' jurisdiction to impose.  The Corps would have
12   exceeded its authority by imposing mitigation requirements outside its jurisdiction.

13   **III.    CONCLUSION**

14   In sum, the Court concludes that the Corps has taken the requisite "hard look" at the
15   environmental consequences of Lone Mountain's development project.  EA 2 goes beyond
16   the usual "concise" and "brief" discussion required of EAs and provides sufficient evidence
17   and analysis of why the Corps decided to issue a FONSI to Lone Mountain.  *See* 40 C.F.R.
18   § 1508.9(a) & (b).  As required by the Corps' NEPA regulations, EA 2 discusses the need for
19   the proposal, alternatives to it, the environmental impacts of the proposal and alternatives,
20   as well as the persons and agencies consulted.  *See id.* § 1508.9(b).  The Court finds that the
21   Corps' decision not to prepare an EIS is founded on a reasoned evaluation of the relevant
22   factors and that the Corps has provided a convincing statement of reasons to explain why the
23   project's impacts are insignificant.  *See Nat'l Parks*, 241 F.3d at 730.  The Corp's decision not
24   to prepare an EIS is in accordance with the law and neither arbitrary, capricious, nor an abuse
25   of discretion.  The Court's standard of review, ultimately, is a narrow one, and the Court "is
26   not empowered to substitute its judgment for that of the agency."  *Overton Park*, 401 U.S.
27   at 415.

28

1    All that remains is a balance of hardships.  Plaintiff has not demonstrated either a

2 strong likelihood of success on the merits or raised serious questions going to the merits of

3 the Corps' compliance with NEPA.  Therefore, Plaintiff must show that the balance of

4 hardships tips sharply in its favor.  Lone Mountain's project has been on hold for four years.

5 The Corps has now fulfilled its requirements under NEPA and CWA.  Plaintiff's hardship

6 and major contention appears to be with any development on Section 16.  This the Court

7 cannot enjoin, and Plaintiff has not demonstrated that the balance of hardships tips sharply

8 in its favor.

9    **IT IS ORDERED** denying Defendant Lone Mountain's Motion to Dismiss Plaintiff's

10 First Supplemental Complaint (Doc. 175).

11    **IT IS FURTHER ORDERED** denying Plaintiff's Motion for a Preliminary

12 Injunction (Doc. 160 and 181).

13

14    DATED this 2nd day of May, 2006.

15

16

17

18    _____
                   Susan R. Bolton
                 United States District Judge

19

20

21

22

23

24

25

26

27

28